**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARMANDO ROMERO-GUTIERREZ, | ) | |
| | ) | |
| Petitioner, | ) | No. 1:19-CV-05195 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| SONJA NICKLAUS, Warden, | ) | |
| Dixon Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

*Pro se* petitioner Armando Romero-Gutierrez seeks a writ of habeas corpus, 28 U.S.C. § 2254,[1] to set aside his convictions for predatory criminal sexual assault of a child and aggravated criminal sexual abuse. R. 1, Habeas Petition; R. 16-1, State Court Record, Exh. A, Direct Appeal Order, at ¶ 2.[2] The petition asserts that his trial counsel was ineffective for failing to object to the admission of certain prior inconsistent statements made by Romero-Gutierrez's wife. R. 1 at 5. As explained in this Opinion, the petition is denied because the Illinois state courts reasonably held that he failed to show that trial counsel's performance prejudiced him, even assuming that the performance was defective.

## I. Background

When considering habeas petitions, federal courts must presume that the factual findings made by the last state court to decide the case on the merits are correct,

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 2241.
[2]Citations to the docket are noted as "R.," followed by the docket entry.

unless the petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Because Romero-Gutierrez has not presented clear and convincing evidence to rebut this presumption, this Court adopts the facts set forth by the Illinois Appellate Court on direct review.

### A. Facts

Romero-Gutierrez was charged with five counts of predatory criminal sexual assault of a child, 720 ILCS 5/11-1.40(a)(1), and 20 counts of aggravated criminal sexual abuse, 720 ILCS 5/11-1.60(b), (c)(1)(i). Direct Appeal Order ¶ 3. He was convicted by jury of two counts of predatory criminal sexual assault of a child and eight counts of aggravated criminal sexual abuse. *Id.* ¶ 2. The victim was his niece, A.D., whom Romero-Gutierrez and his wife, Estela Martinez, would often watch after school, along with her siblings and the Petitioner's own children. *Id.* ¶ 3. A.D. was under 13 years old at all relevant times. *Id.*

The abuse was uncovered in June 2014, when A.D. and her family were at Romero-Gutierrez's house for a Father's Day event. Direct Appeal Order ¶ 4. Estela told her sister, A.D.'s mother Irma Martinez, that A.D. was upset.[3] *Id.* When Irma spoke with A.D., she told her mother that Romero-Gutierrez had touched her "butt." *Id.* When Irma spoke with A.D. some more the next day, A.D. cried and said that Romero-Gutierrez had touched her over a long period of time, since before she had

---

[3]For the sake of clarity, because Estela Martinez and Irma Martinez share the same last name, the Court will refer to them as "Estela" and "Irma" respectively rather than by their last names.

gone to the hospital for cutting her legs (this was eight months prior). *Id.* ¶ 5. A.D. explained that she had cut herself to feel better, because she felt that she could not tell anyone about the abuse. *Id.* A.D. said that Romero-Gutierrez had touched her chest and vagina in addition to her butt; that he had touched her under her clothes; and that he had touched her butt with his penis. *Id.* ¶ 6. A.D. also reported that Romero-Gutierrez had told her to keep the touching secret so as not to upset his wife or A.D.'s parents. *Id.*

The Children's Advocacy Center began to investigate A.D.'s claims shortly after the Father's Day conversation. Direct Appeal Order ¶¶ 9, 12. As they testified at trial, investigator Pamela Ely interviewed A.D. on June 23, 2014, and investigator Tim Martin interviewed Estela Martinez on the same date. *Id.* In her interview with Ely, A.D. related a long history of abuse. *Id.* ¶¶ 12–20. She said that Romero-Gutierrez began touching her when she was 9 or 10 years old, during the after-school hours when he and Estela watched her, her siblings, and her cousins. *Id.* ¶ 12. While A.D. was watching movies in her cousins' bedroom, Romero-Gutierrez would pretend to go to the bathroom—instead he would go into the bedroom to assault her. *Id.* ¶¶ 12, 16. A.D. related that he would touch her chest with his hands, over and under her clothes; on three occasions, he attempted to put his penis in her butt and did so twice, taking off her underwear on one of these occasions; and that he touched her vaginal area while her clothes were on five or six times. *Id.* ¶ 13, 15–17. Romero-Gutierrez told A.D. that if she told anyone what he had done, he would hurt her or her family. *Id.* ¶ 17. A.D. told Ely that the abuse made A.D. angry. *Id.* ¶ 14.

A.D. testified at trial. *Direct Appeal Order* ¶ 15. In trial testimony, she repeated that the abuse made her angry. *Id.* ¶ 20. She began cutting herself as a way of releasing that anger. *Id.* As noted earlier in this Opinion, the cutting was so severe that A.D.'s mother, Irma Martinez, needed to take her to the hospital on at least one occasion. *Id.* ¶ 5.

A.D. was examined by a physician on June 17, 2014. *Direct Appeal Order* ¶ 21. The doctor found no physical evidence of sexual assault. *Id.*

Romero-Gutierrez's argument hinges on the discrepancy between Estela Martinez's testimony at trial, and what investigator Tim Martin testified that she told him on June 23, 2014. Martin testified that Estela recounted the following narrative: Her sister Irma told her what Romero-Gutierrez had done to A.D. sometime in June 2014 after the Father's Day incident. *Direct Appeal Order* ¶¶ 3, 10. Estela then went to Romero-Gutierrez's workplace and confronted him about what he had done. *Id.* ¶¶ 7, 10. She told him that she knew he had touched A.D.'s chest and butt. *Id.* In response, Romero-Gutierrez told her that he had "done something stupid" and wanted to ask A.D.'s parents for forgiveness. *Id.* ¶¶ 10–11. She told him it was not the right time to do so. *Id.* ¶ 11. Estela then told Romero-Gutierrez that she wanted him out of the house. *Id.* ¶ 7. Romero-Gutierrez then picked up his clothes and returned Estela's truck. *Id.* ¶ 8.

At trial, Estela testified somewhat differently. She said only that Irma had told her "something had happened" between Romero-Gutierrez and A.D. *Direct Appeal Order* ¶ 7. She then went to his workplace to speak to him, but could not remember

4

their discussion. *Id.* Estela testified that she did not remember telling Martin that she told Romero-Gutierrez that she knew what he had done to A.D., nor that she told Martin that Romero-Gutierrez had told her that he had done something stupid. *Id.* She did affirm that she told Romero-Gutierrez to get out of the house. *Id.* Estela further testified that she did not remember telling Martin that Romero-Gutierrez told her he wanted to ask forgiveness from Irma and her husband. *Id.* ¶ 8.

After Estela kicked him out of the house, Romero-Gutierrez went to his brother's house in Milwaukee. Direct Appeal Order ¶ 8. Before leaving for Milwaukee, Romero-Gutierrez quit his job abruptly without informing his supervisor or even picking up his final paycheck. *Id.* ¶ 42.

For his part, Romero-Gutierrez testified at trial that he did not abuse A.D., that he had not told Estela that he had done something stupid, and that he had not told Estela that he wanted to apologize to Irma and her husband. Direct Appeal Order ¶ 22. He testified that he left abruptly for Milwaukee only because he had no other place to live after Estela kicked him out. *Id.*

Romero-Gutierrez was then arrested in Milwaukee and charged, prosecuted, and convicted in Kane County, Illinois. Direct Appeal Order ¶¶ 2–3. At the trial, Martin's testimony about his interview with Estela was introduced not only for impeachment purposes (given the inconsistency between Martin's version of the interview and Estela's testimony at trial), but also as substantive evidence. *Id.* ¶ 23. Romero-Gutierrez's attorney did not object—rather, trial counsel even agreed to this

substantive consideration during the jury instructions conference. *Id.* ¶ 11. The jury was allowed to review a transcript of Martin's testimony during its deliberations. *Id.* ¶ 23.

## B. Procedural History

Romero-Gutierrez appealed the convictions and requested a new trial, arguing that his trial counsel was ineffective for failing to object to the admission of Estela Martinez's prior inconsistent statements as substantive evidence. R. 16-2, State Court Record, Exh. B, Appellant's Br., at 23. In March 2019, the Illinois Appellate Court affirmed the judgment of the trial court. Direct Appeal Order ¶ 1. Romero-Gutierrez then filed a rehearing petition with the Illinois Appellate Court. R. 16-5, State Court Record, Exh. E, Pet. for Reh'g. The Appellate Court denied this petition later in March 2019. R. 16-6, State Court Record, Exh. F, Order Denying Pet. for Reh'g. In April 2019, Romero-Gutierrez filed a petition for leave to appeal to the Illinois Supreme Court. R. 16-7, State Court Record, Exh. G, PLA. In May, 2019, the state high court denied the petition for leave to appeal. R. 16-8, State Court Record, Exh. H, Order Denying PLA.

## C. Exhaustion

Those procedural steps were enough to exhaust the ineffective-assistance claim. Federal courts may only consider habeas petitions from state prisoners that allege violations of the "Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and state prisoners must first exhaust state remedies before federal courts may consider their claims. 28 U.S.C. § 2254(b)(1)(A); *see Cullen v. Pinholster*,

563 U.S. 170, 181 (2011). In Illinois, exhaustion of state remedies requires a peti-

tioner to appeal the claim directly to the Illinois Appellate Court and then later file a

petition for leave to appeal to the Illinois Supreme Court. *Guest v. McCann*, 474 F.3d

926, 930 (7th Cir. 2007).

Because Romero-Gutierrez raised the claim of ineffective assistance of trial

counsel in his appeal to the Illinois Appellate Court (which was denied on March 4,

2019), and in his petition for leave to appeal to the Illinois Supreme Court (which was

denied on May 22, 2019), he exhausted state remedies. *See* Direct Appeal Order; Or-

der Denying PLA. Romero-Gutierrez timely filed this habeas petition around two

months after the Illinois Supreme Court's denial of his petition for leave to appeal.

R. 1, Habeas Petition. Romero-Gutierrez likewise claims in the habeas petition that

his trial counsel was ineffective for "failing to object when the state improperly used

purportedly prior inconsistent statements made by his wife as substantive evidence

that he confessed to inappropriately touching the alleged victim." Habeas Pet. at 5.

## II. Analysis

### A. Standard of Review

The Sixth Amendment guarantees criminal defendants the right to effective

assistance of counsel. To receive habeas relief on the merits of his ineffective-assis-

tance-of-counsel claim, Romero-Gutierrez must meet the familiar two-element, per-

formance-and-prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668

(1984). Under *Strickland*, he must show that his trial counsel's performance was de-

ficient and that prejudice resulted. *Id.* at 687. For the performance element, the

question is whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. On prejudice, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Romero-Gutierrez must satisfy *both* elements of *Strickland* to be entitled to habeas relief. *Id.* at 687.

Judicial review of trial counsel's performance "must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. On federal habeas review, this inquiry is *doubly* deferential: not only must the Court presume that "the challenged action might be considered sound trial strategy," *id.* (cleaned up),[4] but under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1), this Court must also defer to the state court's application of *Strickland* unless it is objectively unreasonable, *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

## B. Ineffective Assistance

Romero-Gutierrez has argued that his trial counsel was ineffective for failing to object to the admission of inconsistent statements by his wife, Estela Martinez, as substantive evidence, and that this failure prejudiced him. Pet. at 5. Before addressing the prejudice element, it is worth noting that the Court need not review the

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

performance element. The State does not contend that the inconsistent statements were properly admitted, nor does the State dispute that trial counsel was objectively reasonable in failing to object. Indeed, the Illinois Appellate Court assumed that counsel's representation was inadequate. Direct Appeal Order ¶ 26. So the real issue here is whether the prejudice element under *Strickland* has been satisfied.

The prejudice element asks whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. Romero-Gutierrez has the "burden to show that his defense attorney's performance was deficient and that the deficient performance prejudiced his defense." *Lee v. Avila*, 871 F.3d 565, 571 (7th Cir. 2017). Had counsel's performance not been deficient, "[t]he likelihood of a different result must be *substantial*, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (emphasis added); *see also Felton v. Bartow*, 926 F.3d 451, 466 (7th Cir. 2019).

"A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 669. "In deciding whether there is a reasonable probability that the errors changed the outcome of the trial, the court must consider all of the evidence. Logically, a verdict weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Cook v. Foster*, 948 F.3d 896, 909 (7th Cir. 2020). Here, the Illinois Appellate Court reasonably concluded that Romero-Gutierrez was not prejudiced by his trial counsel's deficient performance because of the strength of the properly admitted evidence. Direct Appeal Order ¶ 39.

First and foremost, A.D. herself testified, describing the extent of the abuse and the number of times Romero-Gutierrez abused her, in detail. *See, e.g.*, R. 16-11, State Court Record, Exh. K, Report of Proceedings, at 452, 469. So the evidence introduced through investigator Martin was not crucial. A.D. also testified that Romero-Gutierrez had told her not to tell anyone of the abuse, *see id.* at 461, 470, and that the abuse had led her to cut herself, *id.* at 485. A.D.'s testimony was corroborated by her interview with investigator Pamela Ely, a video of which was played for the jury. Direct Appeal Order ¶ 12; *see also* R. 16-12, State Court Record, Exh. L, Transcript of Victim Interview by County Investigator Pamela Ely, at 8, 9, 11. What's more, A.D.'s father testified that he noticed changes in A.D. after the abuse started: specifically, A.D. became upset when her family would go over to Romero-Gutierrez's and Martinez's home, Rpt. of Proceedings at 535, and that at one point she stayed in the car for at least an hour by herself so that she would not have to go into the house, *id.* A.D.'s mother testified that her daughter recounted the abuse to her, *id.* at 517, that A.D. told her she cut herself as a response to the abuse, *id.* at 516, and that A.D.'s grades decreased after the abuse started, *id.* at 519.

Even Estela conceded, at trial, that she confronted Romero-Gutierrez about his alleged abuse of A.D. after her sister Irma, A.D.'s mother, "told [Estela] what had happened." Rpt. of Proceedings at 606. Even without considering Martin's testimony about Estela's prior statements as substantive evidence, the jury was able to evaluate Estela's own testimony at trial.

On top of all that, Romero-Gutierrez himself testified. Even though he denied abusing A.D., his own testimony scored solid circumstantial points against him. He conceded that, after Estela confronted him, he left town for Milwaukee—without picking up his last paycheck, without notifying his supervisor at work, and even without saying goodbye to his three children. Rpt. of Proceedings at 694, 700–01. Romero-Gutierrez characterizes A.D.'s testimony as the only properly admitted potential evidence of his guilt. Pet. at 5(D). But his own testimony buttressed the conclusion that he essentially left Illinois out of consciousness of guilt. "Juries are permitted to consider flight as evidence of consciousness of guilt and thus of guilt itself." *United States v. Brown*, 973 F.3d 667, 695 (7th Cir. 2020) (cleaned up). The Illinois Appellate Court reasonably characterized Romero-Gutierrez's flight as "evidence of his consciousness of guilt." Direct Appeal Order ¶ 42. "The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993). Romero-Gutierrez has the burden to challenge the state court's finding on this point, and has done nothing to undermine any of the inferences in that chain of reasoning.

Romero-Gutierrez argues that A.D.'s testimony is weak and should not have been credited by the jury. Pet. at 5(E). He points to several inconsistencies in A.D.'s testimony. First, he observes that, although A.D. stated to investigator Ely that

11

Romero-Gutierrez abused her in her cousin's bedroom, at trial, A.D. testified that the abuse happened in Romero-Gutierrez's own bedroom. *Id.* at 5(D)–5(E). Second, he observes that A.D. told investigator Ely that the door was closed during the abuse, whereas at trial, she testified that the door was open. *Id.* at 5(E). Third, A.D. told investigator Ely that Romero-Gutierrez told her that he would go to jail and get a divorce if she told anyone about the abuse, whereas at trial, A.D. testified that Romero-Gutierrez had threatened to hurt her family if she told anyone about the abuse. *Id.* Finally, A.D. did not know exactly how old she was when the abuse began, and she did not immediately report the abuse, which Romero-Gutierrez takes as further evidence undermining her testimony. *Id.*

But the jury, having heard A.D.'s testimony and watched a video of her interview with Ely, is "free to credit witnesses and resolve any inconsistencies in their testimony however it sees fit, and [this Court] will not disturb their credibility findings." *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003). These inconsistencies are minor compared with the consistency of A.D.'s statements describing the abuse and how it happened, and it is not surprising that a person recounting a series of events—especially traumatic events—that happened over a number of years would forget minor details. *See, e.g., Vargas v. Price*, 2021 WL 698500, at *11 (N.D. Ill. Feb. 23, 2021). What's more, as the State argues, the inconsistencies do not directly undermine any of the elements of the crime that the State was required to prove: "A.D.'s testimony, like her prior statements to Ely, described two incidents in which petitioner sodomized her … the bedroom where it happened is beside the point." R. 15,

12

Answer at 12. The Illinois Appellate Court reasonably concluded that these minor inconsistencies were only "collateral details that do not detract from the overall consistency of her [A.D.'s] accounts." Direct Appeal Order ¶ 43.

Lastly, Romero-Gutierrez argues that the improperly admitted statements were "tantamount to confessions" and are therefore so damaging that they are inherently prejudicial. Pet. at 5(C). He challenges the Illinois Appellate Court's holding that Estela's prior inconsistent statements to Martin did not amount to confessions because they did not "contain the type of detail" found in a confession. Direct Appeal Order ¶ 38. In a "full confession," a defendant "discloses the motive for and means of the crime." *Kamlager v. Pollard*, 715 F.3d 1010, 1018 (7th Cir. 2013) (cleaned up). That is not what Martin recounted in describing what Estela said. According to Martin, Estela said only that Romero-Gutierrez acknowledged that "he had done something stupid and that he wanted to ask for forgiveness." Direct Appeal Order ¶ 38. Although this acknowledgment is inculpatory, it is a far cry from a detailed confession.

Moreover, it is unlikely that the jury relied heavily on Martin's testimony about Estela's statements. The State did not refer to the improperly admitted inconsistent statements as "confessions" in either the opening or closing arguments. Rpt. of Proceedings at 424–26 (State's Opening Statement); Rpt. of Proceedings at 733–52, 761–73 (State's Closing Statement). The State mentioned the improperly admitted inconsistent statements only once during its opening statements, *id.* at 425, and twice during its closing statement, *id.* at 737, 770. Finally, although the jury asked

13

for a summary of Estela's interview with Martin, the trial court ended up not providing the jury with a summary because the jury returned its verdict before the summary was prepared, though the jury was allowed to review a transcript of Martin's testimony. *Id.* at 806–07; Direct Appeal Order ¶ 23. The Illinois Appellate Court reasonably concluded that the overall lack of emphasis on Martin's description of what Estela said provided yet another reason to find a lack of prejudice.

In sum, Romero-Gutierrez was not prejudiced by the trial court's admission of his wife's prior inconsistent statements as substantive evidence. Taken as a whole, the evidence of Romero-Gutierrez's guilt—including the victim's testimony, the testimony of her parents, the properly admitted testimony of Romero-Gutierrez's wife, Romero-Gutierrez's own testimony, and his abrupt departure from Illinois—is overwhelming. Romero-Gutierrez has not rebutted any of the Illinois Appellate Court's factual findings by clear and convincing evidence, as he is required to do, *see* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012), and he offers no reasonable argument that the verdict would have come out differently had the jury not considered the mildly inculpatory statements. The habeas petition is denied.

## C. Certificate of Appealability

In order to appeal the denial of a habeas petition, a petitioner must first obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A); *Jennings v. Stephens*, 574 U.S. 271, 275 (2015). A certificate may issue only when the applicant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Jennings*, 574 U.S. at 282. The substantial showing "standard is met when reasonable

14

jurists could debate whether … the petition should have been resolved in a different manner." *Welch v. United States,* 136 S. Ct. 1257, 1263 (2016) (cleaned up). Here, given the overwhelming evidence against Romero-Gutierrez, reasonable jurists could only conclude that the Illinois Appellate Court reasonably rejected his argument on prejudice. No certificate of appealability shall issue from this Court.

### III. Conclusion

The habeas petition is denied, and the Court declines to issue a certificate of appealability. The tracking status hearing of October 8, 2021, is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 13, 2021

15